**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**
**SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| United States of America, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER DENYING DEFENDANT'S** |
| | ) | **PETITION FOR HABEAS CORPUS** |
| vs. | ) | **RELIEF UNDER 28 U.S.C. § 2255** |
| | ) | |
| Rosalio Guitron Vargas, | ) | |
| | ) | Case No. 1:03-cr-046 |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| Rosalio Guitron Vargas, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | Case No. 1:06-cv-063 |
| | ) | |
| United States of America, | ) | |
| | ) | |
| Respondent. | ) | |

Before the Court is the Defendant's pro se petition under 28 U.S.C. § 2255 to vacate, set aside, or correct sentence, filed on August 7, 2006. On August 9, 2006, the Court reviewed the motion and ordered the Government to file a response. On October 6, 2006, the Government filed a response requesting that the Court deny the Defendant's motion for post-conviction relief. The Defendant filed a reply brief on November 2, 2006. For the reasons set forth below, the motion is denied.

## I.   BACKGROUND

On July 9, 2003, the defendant, Rosalio Guitron Vargas ("Vargas"), was charged in a nine-count indictment with various drug and firearm offenses. Count One charged Vargas and four other individuals with conspiracy to distribute and possess with intent to distribute methamphetamine.

Count Seven charged Vargas with distribution of methamphetamine.  Count Eight charged Vargas with distribution of marijuana.  Count Nine charged Vargas with possession of a firearm by an illegal alien.  See Docket No. 11.  On December 18, 2003, a jury found Vargas guilty on all counts. See Docket No. 131.  As to Count One, the jury found that the conspiracy involved over 50 grams of methamphetamine or over 500 grams of a mixture or substance containing a detectable amount of methamphetamine.  The jury also found that as to Count Seven, Vargas distributed 50 grams or more of a mixture of substance containing a detectable amount of methamphetamine.

Vargas was sentenced on February 26, 2004.  The Presentence Investigation Report ("PSR") calculated a total offense level of 42 and criminal history category V, yielding an advisory Sentencing Guideline range of 360 months to life.  See PSR, pp. 14-17.  The total offense level of 42 was arrived at by starting with a base offense level of 34 because Vargas' offenses involved 2,496.12 grams of methamphetamine (equivalent to 4,9992 kilograms of marijuana) and over 0.45 kilograms of marijuana.  Eight levels were added to Vargas' offense level for the following:  (1) two levels under U.S.S.G. § 2D1.1(b)(1) for possession of a dangerous weapon during his drug crimes; (2) four levels under U.S.S.G. § 3B1.1(a) for being a leader and organizer of criminal activity involving five or more participants; and (3) two levels under U.S.S.G. § 3C1.1 for obstruction of justice.  As to the firearms conviction on Count Nine, it was calculated as an offense level of 24. See PSR, ¶ 14-17.  Vargas objected to the calculations.  The Court rejected Vargas' objections and found that the sentencing enhancements were supported by the trial testimony.  See Sentencing Tr. 5-9.  The Court accepted the guideline calculations in the PSR and sentenced Vargas to a 360-month term of imprisonment.  See Docket No.  149.

On March 3, 2004, Vargas filed a notice of appeal.  See Docket No. 151.  Vargas appealed his conviction and sentence.  On appeal, Vargas argued (1) that he was prejudiced because the

evidence established two conspiracies rather than one; (2) that his Sixth Amendment right to be present at trial was violated when he was not present at a pretrial conference; (3) that the Court erred when it occasionally failed to admonish the jury not to discuss the case amongst themselves; and (4) that his sentence violated United States v. Booker, 543 U.S. 220 (2005), which was handed down while Vargas' appeal was pending.  See United States v. Barth, 424 F.3d 753 (8th Cir. 2005).  The Eighth Circuit Court of Appeals rejected Vargas' claims and affirmed his conviction and sentence. Id.

On August 7, 2006, Vargas filed a motion under 28 U.S.C. § 2255.  Vargas asserts that both his trial and appellate counsel were ineffective.  As to his trial counsel, Vargas asserts eight alleged deficiencies:  (1) he was denied counsel of his choice; (2) his counsel had an actual conflict of interest; (3) counsel failed to object to inadmissible hearsay; (4) counsel failed to move for a severance; (5) counsel failed to move to suppress Vargas' statement to police; (6) counsel failed to move to suppress testimony of Government witnesses based on unduly suggestive identification process; (7) counsel failed to adequately cross-examine and impeach Government witnesses; and (8) counsel failed to review the Presentence Investigation Report with Vargas.  As to his appellate counsel, Vargas asserts counsel failed to raise two issues on appeal:  (1) the lack of findings to support a four-level enhancement under Section 3B1.1(a) and (2) the lack of findings to support a two-level enhancement under Section 2D1.1(b)(1).

## II.   LEGAL DISCUSSION

### A.   INEFFECTIVE ASSISTANCE OF COUNSEL

The burden of demonstrating ineffective assistance of counsel is on a defendant.  United States v. Cronic, 466 U.S. 648, 658 (1984); United States v. White, 341 F.3d 673, 678 (8th Cir.

3

2003).  To be eligible for habeas relief based on ineffective assistance of counsel a defendant must meet the two-part test announced in Strickland v. Washington, 466 U.S. 668, 687 (1984).  A defendant must first establish that counsel's representation was constitutionally deficient, which requires a showing that counsel's performance fell below an objective standard of reasonableness. Id. at 687-88; see Wiggins v. Smith, 539 U.S. 510 (2003).  This requires showing that counsel made errors so serious that defense counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Strickland v. Washington, 466 U.S. 688, 687 (1984).  In considering whether this showing has been accomplished, "[j]udicial scrutiny of counsel's performance must be highly deferential."  Id. at 689.  If the underlying claim (i.e., the alleged deficient performance) would have been rejected, counsel's performance is not deficient.  Carter v. Hopkins, 92 F.3d 666, 671 (8th Cir. 1996).  Courts seek to "eliminate the distorting effects of hindsight" by examining counsel's performance from counsel's perspective at the time of the alleged error.  Id.

A defendant must then show that the deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984).  This requires proving that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been more favorable to the defendant.  Id. at 690-91.  A reasonable probability  is one "sufficient to undermine confidence in the outcome."  Wiggins v. Smith, 539 U.S. 510, 534 (2003).  Merely showing a conceivable effect is not enough.  When evaluating the probability the result would have been different, a court views the alleged error in light of the totality of all the evidence before the jury to gauge the effect of the error.  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986); Williams v. United States, 452 F.3d 1009, 1013 (8th Cir. 2006).

Where a defendant raises multiple claims of ineffective assistance, each claim of ineffective assistance must be examined independently rather than collectively. Hall v. Luebbers, 296 F.3d 385, 692-93 (8th Cir. 2002); Griffin v. Delo, 33 F.3d 895, 903-04 (8th Cir. 1994).

### 1.   INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

#### a.   CHOICE OF COUNSEL

Vargas contends that he was denied counsel of his choice and asserts that a criminal defendant has a Sixth Amendment right to counsel of his or her choice. The Government responds by noting that an indigent defendant has no constitutional right to have a particular attorney appointed to represent him and that Vargas did not state that he wanted to retain another attorney. Vargas replies that any failure on his part to specifically inform the Court that he wanted to retain an attorney was due to his inability to fully and proficiently understand and communicate in English.

On November 7, 2003, Vargas submitted a letter to the Court requesting that his court-appointed counsel be dismissed from the case. See Docket No. 87. Vargas asserted that his attorney had a "conflict of interest in the way he [was] handling [his] case." See Docket No. 87. Vargas asked for another attorney "to be appointed to [his] case." See Docket No. 87. The Court treated the letter as a Motion for Attorney Substitution. See Docket No. 87.

On November 13, 2003, the Court held a hearing regarding Vargas' motion. A Spanish/English interpreter was present throughout the hearing. See Transcript of Hearing on November 13, 2003.[1] On November 14, 2004, the Court issued an order denying Vargas' request

---

[1] For the sake of simplicity, the Court will refer to the transcript from the November 13, 2002, hearing on Vargas' Motion for Attorney Substitution as the "Hearing Tr."

for substitute counsel.  See Docket No. 90.  Vargas now contends that he intended to retain his own attorney and that his failure to clearly articulate this information was based on his limited ability to understand English.

The record reflects that at all times during the hearing and during discussions with his attorney, Vargas had access to an interpreter.  Vargas submitted an affidavit from Wahnita Hernandez who states that she was willing to hire an attorney for Vargas in October of 2003.  See Docket No. 209.  However, Vargas failed to provide such information to the Court at the time he requested substitute counsel.

It is well-established that an indigent criminal defendant has no constitutional right to have a particular attorney.  United States v. Gonzalez-Lopez, 399 F.3d 924, 928-29 (8th Cir. 2005) ("A non-indigent criminal defendant's Sixth Amendment rights encompass the right to be represented by the attorney selected by the defendant" and "an accused who is financially able to retain counsel of his own choosing must not be deprived of a reasonable opportunity to do so, the right to retain counsel of one's choice is not absolute."); see also United States v. Espino, 316 F.3d 788, 798-99 (8th Cir. 2003).  Vargas fails to appreciate the distinction between an indigent defendant and a defendant with the financial ability to retain counsel.  Vargas had no right to counsel of his choice.  Thus, the Court finds that Vargas' assertion that his Sixth Amendment rights were violated must fail as a matter of law.

As to Vargas' claim that his failure to inform the Court that he wished to retain counsel should be excused because of his poor understanding of English, the Court finds this claim to be without merit.  The record reflects that an interpreter was present at the hearing on November 13, 2003, and at various meetings between Vargas and his attorney.  Near the end of the November 13, 2003, hearing, the Court gave Vargas an opportunity to address any other issues at the hearing, and

Vargas declined.  See Hearing Tr. 20.  The record is devoid of evidence to support Vargas' claim that his failure to articulate his desire to retain counsel should be excused because he did not understand English.  Vargas has failed to establish that his Sixth Amendment right to counsel was violated.

### b.   CONFLICT OF INTEREST

Vargas contends that his trial counsel had a conflict of interest with the case and thus, he received ineffective assistance of counsel at trial.  Vargas sets forth three theories to support the conflict of interest claim.  First, Vargas contends that he and his attorney had a complete breakdown of communications.  Second, Vargas asserts that an irreconcilable conflict of interest arose when his trial counsel opposed Vargas' request for a new attorney.  Finally, Vargas asserts that his counsel previously represented two Government witnesses:  Russell Lipp and Leslie L. Schmidt.  Vargas contends that his trial counsel secured immunity from prosecution for Lipp and that Lipp subsequently testified before the grand jury and at trial.  Vargas contends that his counsel's failure to cross-examine Lipp at trial was based on the conflict of interest.  Vargas asserts that counsel's previous representation of Schmidt was also a conflict of interest.

Justifiable dissatisfaction sufficient to warrant that new counsel be appointed includes a conflict of interest, an irreconcilable conflict, or a complete breakdown in communications between the attorney and the defendant.  United States v. Exson, 328 F.3d 456 (8th Cir. 2003) (quoting Smith v. Lockhart, 923 F.2d 1314, 1320 (8th Cir. 1991)).  The proper focus in evaluating claims of dissatisfaction with counsel is on the quality of the advocacy.  When a defendant makes a request for substitute counsel, the Court should inquire into the reason(s) for the defendant's dissatisfaction with his attorney before ruling on the request.  See McMahon v. Fulcomer, 821 F.2d 934 (3rd Cir. 1987).

7

### i)      **COMMUNICATION BREAKDOWN**

At the November 13, 2006, hearing, the Court questioned Vargas as to why he wished to have new counsel appointed. <u>See</u> Hearing Tr. 4-6, 9-10, 13. Vargas gave several reasons for his dissatisfaction with appointed counsel including (1) his attorney became upset with him when he repeatedly asked the same questions (Hearing Tr. 5-6); (2) Vargas felt he should have been offered a more lenient plea from the government (Hearing Tr. 9-10); and (3) Vargas' attorney had not stopped the media coverage of the case (Hearing Tr. 14). Vargas acknowledged that he had met with his attorney multiple times (Hearing Tr. 8); that his attorney was very familiar with the facts of the case (Hearing Tr. 9, 13); and that his attorney had shared the discovery information with him (Hearing Tr. 13). The Court also gave Vargas an opportunity to address any other issues at the hearing, and Vargas declined. <u>See</u> Hearing Tr. 20.

On November 14, 2004, the Court issued an order denying Vargas' request for substitute counsel. <u>See</u> Docket No. 90. The Court found that Vargas had failed to show a justifiable dissatisfaction with counsel and that there had been no evidence presented to show any conflict of interest, an irreconcilable conflict, or a complete breakdown of communications between Vargas and his counsel. The Court also noted that it was aware of the fact that Vargas' attorney had recently represented Vargas in a different criminal case in federal court with no complaints or concerns raised by Vargas as to the handling of that matter.

It is well-established that frustration with counsel's tactics, or antagonism between a defendant and his counsel are not sufficient to warrant new counsel. <u>United States v. Boone</u>, 437 F.3d 829, 839 (8th Cir. 2006). The burden is on the defendant to establish "justifiable dissatisfaction" with his attorney. <u>United States v. Davidson</u>, 195 F.3d 402, 407 (8th Cir. 1999).

The reason(s) for Vargas' dissatisfaction primarily relate to his concerns about plea negotiations with the Government and the more favorable treatment shown to other defendants in other drug cases. In addition, Vargas raised unfounded concerns about the adverse publicity generated in the press, but such reasons are insufficient. Vargas has failed to establish any conflict of interest, an irreconcilable conflict, or a complete breakdown of communications between the attorney and the defendant. The Court finds that Vargas has failed to show a justifiable dissatisfaction with counsel that would have permitted substitute counsel. Thus, the Court finds that Vargas has failed to establish a conflict of interest as to this issue.

### ii)        OPPOSITION TO REQUEST FOR A NEW ATTORNEY

Vargas also contends that once his attorney opposed the request for substitution of counsel, a conflict arose. Vargas asserts that his attorney told him that because of the complexity of the case and the fast-approaching trial date, there was not sufficient time for a new attorney to handle the case. The Government asserts that nothing in the record reflects that Vargas' counsel opposed the motion for substitute counsel. Rather, the Government contends that counsel was simply advising Vargas that it would be unlikely a new attorney would be appointed. In addition, the Government notes that Vargas did not consistently and vigorously object to the continued representation by his appointed counsel.

Contrary to Vargas' assertions, the record does not establish that Vargas' counsel opposed the motion for substitute counsel. A thorough review of the transcript of the November 13, 2003, hearing reveals that Vargas' counsel indicated he was prepared to proceed to trial and would do his best to represent Vargas. See Hearing Tr. 11-12. The record is devoid of any evidence to support Vargas' assertion that his counsel opposed the motion for substitution of counsel. The Court finds

that Vargas has failed to establish that trial counsel opposed the motion for substitute counsel.  As a result, Vargas has failed to establish a conflict of interest as to this issue.

### iii)     COUNSEL'S PRIOR REPRESENTATION OF TWO GOVERNMENT WITNESSES

Vargas asserts that trial counsel's prior representation of two Government witnesses shows that counsel had a conflict of interest which rendered his assistance ineffective.  The Government acknowledges that Vargas' counsel represented Government witness Russell Lipp and arranged immunity for him to testify before a grand jury, and that Vargas' counsel represented Government witness Leslie Schmidt in a divorce proceeding in 1995.  It is undisputed that the record reflects that the Court was unaware of any of this information prior to trial.

The standard of review upon a claim of conflict of interest depends on the nature of the alleged conflict and whether the conflict was brought to the attention of the trial court.  The United States Supreme Court had held that when defense counsel is appointed to represent multiple co-defendants and one of the defendants objects to the multiple representation, a trial court is under a duty to inquire into the potential conflicts and failure to make such an inquiry results in the presumption of prejudice and automatic reversal.  Holloway v. Arkansas, 435 U.S. 475, 488-90 (1978).  However, when no objection to multiple representation is raised in the trial court, the United State Supreme Court has held that a defendant was required to show that an "actual conflict of interest adversely affected his lawyer's performance" before habeas relief could be granted.  Cuyler v. Sullivan, 446 U.S. 335, 348-49 (1980).  Even in a situation where the trial court knew or reasonably should have known of a potential conflict (defense counsel had previously represented the victim of an alleged crime in a separate criminal proceeding), the United States Supreme Court

held that a defendant was still required to show that the conflict adversely affected counsel's performance before habeas relief could be granted. Mickens v. Taylor, 535 U.S. 162, 173-174 (2001).

The Eighth Circuit has not squarely addressed whether the rule from Cuyler requiring a defendant to show that the alleged conflict adversely affected counsel's performance should be applied outside of cases involving "multiple representation of codefendants or serial representation of defendants." Caban v. United Staets, 281 F.3d 778 (8th Cir. 2002). The Eighth Circuit noted that other circuits had limited the application of Cuyler because not all cases involving a "conflict of interest are well suited to resolution under the strict rule of Cuyler," and at least one circuit has applied the prejudice requirement of Strickland in conflict cases not involving multiple representation. Id. The Eighth Circuit ultimately held that it need not determine whether to apply the Strickland or Cuyler standard because the defendant's claim failed under either standard. Id. at 783.

The Eighth Circuit recently clarified the standard a habeas petitioner must demonstrate to meet the Cuyler standard that "an actual conflict of interest adversely affected his defense." Winfield v. Roper, 460 F.3d 1026, 1038-39 (8th Cir. 2006).

> To be successful [a petitioner] would have to identify an actual demonstrable adverse effect, not merely an abstract or theoretical one . . . . To establish that there was a conflict in representation, the [petitioner] must show that the conflict caused the attorney's choice to engage or not to engage in particular conduct . . . . Such a showing required the [petitioner] to identify a plausible alternative defense strategy or tactic that defense counsel might have pursued; show that the alternative strategy was objectively reasonable under the facts of the case; and establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict.

Winfield v. Roper, 460 F.3d 1026, 1039 (8th Cir. 2006). The Eighth Circuit cautioned once again that "the Cuyler rule presuming prejudice has not been extended by the Supreme Court beyond cases

in which an attorney has represented more than one defendant, . . . and [the Eighth Circuit] has never determined whether it should be applied to other cases." Winfield v. Roper, 406 F.3d 1026, 1039 (8th Cir. 2006). Just as the Eighth Circuit concluded in Winfield, this Court need not decide whether the Cuyler rule extends to cases beyond those involving joint representation, because Vargas' claim fails under both the Cuyler rule and the traditional Strickland test. Vargas fails to appreciate that he must establish more than the simple fact that his defense counsel previously represented Lipp and Schmidt.

As previously discussed, under the Cuyler rule a defendant is required to show that an actual conflict of interest adversely affected his defense. See Cuyler v. Sullivan, 446 U.S. 335, 348 (1980). Thus, to be successful, Vargas would have to identify an actual and demonstrable adverse effect, "not merely an abstract or theoretical one." United States v. Flynn, 87 F.3d 996, 1001 (8th Cir. 1996). "To establish that there was a conflict in representation, the defendant must show 'that the conflict caused the attorney's choice' to engage or not to engage in particular conduct." Winfield v. Roper, 406 F.3d 1026, 1039 (8th Cir. 2006)(quoting Covey v. United States, 377 F.3d 903, 906 (8th Cir. 2004)). Such a showing requires the defendant to "identify a plausible alternative defense strategy or tactic that defense counsel might have pursued," "show that the alternative strategy was objectively reasonable under the facts of the case," and "establish that the defense counsel's failure to pursue that strategy or tactic was linked to the actual conflict." Winfield v. Roper, 406 F.3d 1026, 1039 (8th Cir. 2006) (quoting Covey v. United States, 377 F.3d 903, 908 (8th Cir. 2004)).

As to the alleged conflict with Government witness Russell Lipp, Vargas must identify a plausible defense strategy that was objectively reasonable under the facts of the case, and further establish that counsel's failure to pursue that strategy was linked to the actual conflict. Vargas asserts that defense counsel's failure to cross-examine Lipp was a result of the conflict. However,

a review of the trial transcript reveals that Lipp did not implicate Vargas in any manner or even mention Vargas' name at trial.  See Trial Transcript, 714-737.  Lipp also did not mention Vargas' co -defendant Thomas Pinks, and Pinks' counsel also declined to cross-examine Lipp.  Vargas contends that Lipp's testimony did incriminate Vargas because prior testimony had identified Vargas as the ring-leader and thus, any testimony about co-defendant Shawn Barth indirectly implicated Vargas.  Vargas asserts that his counsel should have cross-examined Lipp about his immunity agreement and his knowledge of who was Barth's source for the methamphetamine. Finally, Vargas asserts that at the time of sentencing he was held accountable for all of the drugs distributed by Barth and, as a result, Lipp's testimony impacted his sentence.

Vargas has failed to establish that defense counsel's decision not to cross-examine Russell Lipp was linked to the alleged conflict.  The Court finds that it is not unreasonable for an attorney to forego cross-examining a witness if the witness does not implicate his client.  Further, Vargas' co-defendant's counsel vigorously cross-examined Lipp as to the amount of drugs he received and saw in the possession of co-defendant Barth and the extent of Lipp's criminal history.  Vargas' co-defendant's counsel was able to elicit testimony from Lipp that he had lied to law enforcement officers.  See Trial Tr. 731-734.  Under the circumstances, the Court finds that Vargas has failed to establish a plausible defense strategy that was objectively reasonable under the facts of the case and that counsel's failure to pursue such a strategy was linked to the alleged conflict.  Thus, the Court finds that as to Government witness Russell Lipp, Vargas has failed to establish that under either the Cuyler or Strickland standards that defense counsel had a conflict of interest which rendered his assistance ineffective.

As to Government witness Leslie Schmidt, the record reveals that Vargas' counsel had represented Schmidt in a divorce proceeding in 1995.  Defense counsel's representation of Schmidt

ended well before criminal charges against Vargas were pursued in federal court. The record is devoid of any indication that information from the divorce case would be relevant or somehow detrimental to Vargas. At trial, Schmidt testified regarding incidents occurring in 2000 and 2002, long after the conclusion of the divorce proceedings. As a result, the Court finds that Vargas has failed to establish a conflict.

Even if the Court were to conclude that a potential conflict of interest existed, Vargas would still be required to demonstrate that he was prejudiced because of the potential conflict. Schmidt testified that on two occasions in 2000, Vargas came into the business where she was employed looking for co-defendant Shawn Barth and that she assisted Vargas in contacting Barth. Essentially, Schmidt linked Vargas to Barth in 2002. Vargas has failed to identify an objectively reasonable defense strategy that counsel failed to pursue because of the alleged conflict. The Court finds that as to Government witness Leslie Schmidt, Vargas has failed to establish that under either the Cuyler or Strickland standards that defense counsel had a conflict of interest which rendered his assistance ineffective.


### c.    HEARSAY

Vargas contends that his counsel was ineffective for failing to object to the admission of hearsay testimony and that the testimony violated his right to confrontation. Vargas argues that Detective Roger Becker presented hearsay when he testified about a voicemail message he received from co-defendant Nancy Ferneau. In the message, Ferneau stated that Vargas had crawled through her daughter's window, told Ferneau's daughter that Ferneau had "fucked him over," advised that he was going to take care of it, and declared that he wanted to get a gun. See Trial Tr. 1240. Detective Becker testified that Ferneau called the next day to tell him that Vargas and his friends

were in town  and that Vargas had told Ferneau's daughter that Ferneau was to keep her mouth shut.

<u>See</u>  Trial Tr. 1240-1241.  As Vargas points out, there was no objection to this testimony.

Vargas asserts that his counsel was ineffective for failing to object to this testimony as

hearsay.   Vargas also complains that the Government referred to the evidence in its closing and

rebuttal arguments.  The Government asserts that the testimony was not hearsay, and even if it was,

Vargas has failed to show that he was prejudiced by his counsel's failure to object.

Rule 801(c) of the Federal Rules of Evidence defines hearsay as:

> a statement, other than one made by the declarant while testifying at the trial . . . ,
> offered in evidence to prove the truth of the matter asserted.

Fed. R. Evid. 801(c).  There is no question that the testimony regarding Ferneau's voicemail and

subsequent contact with Detective Becker was not offered for the truth of the matter asserted.  As

the Government noted in its closing and rebuttal arguments, the evidence was used to show

Ferneau's involvement in the conspiracy, not to provide that Vargas had threatened Ferneau's

daughter.  <u>See</u> Trial Tr. 1391-1395; 1488-1489.  Thus, Vargas' counsel's failure to object to the

testimony of Detective Becker cannot be considered ineffective because there was no basis for the

objection.

Vargas makes a passing assertion that the admission of Detective Becker's testimony was

also a  violation of his confrontation rights.  As to the issue of Vargas' right to confrontation, the

Eighth Circuit has held that the existence  of a conspiracy need not be proved before any of the

statements of a co-conspirator are admitted so long as it is shown during the Government's case, by

a preponderance of the evidence, that a conspiracy existed; that the declarant was a participant in

that conspiracy; and that the declaration was made during the course of, and in furtherance of, the

conspiracy.  <u>United States v. Bell</u>, 573 F.2d  1040, 1043 (8th Cir. 1978); <u>United States v. Macklin</u>,

573 F.2d 1046, 1048 (8th Cir. 1978).  There is no question that a preponderance of the evidence established that a conspiracy existed; that Vargas was a participant in that conspiracy; and that Vargas' threat was made during the course of, and in furtherance of, the conspiracy.  The Eighth Circuit has held that threats made by co-conspirators to other co-conspirators or other cooperating witnesses are admissible to show bias on the part of a cooperating witness and guilt on the part of a co-conspirator.  See United States v. Walter, 461 F.3d 1005, 1009 (8th Cir. 2006) (cooperating co-conspirator's threat admissible to show bias) United States v. Montano-Gudino, 309 F.3d 501, 505 (8th Cir. 2002) ("threat relevant to show the conspirators' consciousness of guilt"); United States v. Reddx, 106 F.3d 236, 239 (8th Cir. 1997)("evidence of death threats against cooperative witnesses is generally admissible against a criminal defendant to show an admission by conduct or knowledge of guilt of the crime charged").  The Court finds that any objection to the testimony regarding the threat made by Vargas would have likely failed and that the evidence would have been admitted.

Even if the Court were to assume that Detective Becker's testimony was hearsay or a violation of the confrontation clause, Vargas must also show that the deficient performance prejudiced his defense.  In other words, Vargas must show that  there was a reasonable probability that, but for counsel's ineffectiveness, the result of the proceeding would have been different.  When evaluating the probability the result would have been different, a court views the alleged error in light of the totality of all the evidence before the jury to gauge the effect of the error.  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986); Williams v. United States, 452 F.3d 1009, 1013 (8th Cir. 2006).

As noted previously, after a jury trial during which dozen of witnesses testified, Vargas was found guilty of four drug and firearm offenses.  The Government provided a thorough summary of the witnesses and evidence that implicated Vargas in the drug and firearm offenses.

Rigaberto Fernandez provided substantial evidence implicating Vargas. Fernandez, who admitted he was also known as "Beto" (Tr. 873), testified that Vargas recruited him to haul drugs from Washington to Bismarck (Tr. 838-39). Fernandez made eight successful trips but was caught in Montana on the ninth trip (Tr. 840, 847). Upon arriving in Bismarck, Fernandez would deliver the drugs to Ferneau's trailer at Vargas' direction (Tr. 843). Once there, Vargas, and Ferneau would divide up the drugs. (Tr. 846). Ferneau would then call people who would arrive and obtain methamphetamine (Tr. 848). Fernandez testified that one of the persons who obtained drugs at Ferneau's was James Rhone (Tr. 864). Barth was another person who would go to Fernearu's after the drugs arrived and obtain drugs (Tr. 848-49, 878).

James Rhone's testimony, which corroborated Fernandez's testimony, also implicated Vargas. Rhone testified that he was obtaining drugs from Ferneau at her house, and it was there that he first saw "Poncho" and Fernandez (Tr. 912-16). At trial, witnesses identified Vargas as "Poncho" (Tr. 843, 960-61). Vargas and Fernandez approached Rhone about selling drugs for them (Tr. 915-16, 925). Rhone was present when Vargas and Fernandez brought drugs to Ferneau's, and he obtained drugs from Vargas at Ferneau's (Tr. 917, 920). This corroborated Fernandez's testimony about where the drugs were taken when Fernandez arrived in Bismarck and what was done with the drugs. Rhone also testified that Vargas and Fernandez told him the drugs were coming from Washington (Tr. 917), just as Fernandez testified. Rhone's wife, Patricia Rhone, also testified to obtaining drugs from Vargas or Fernandez (Tr. 962-64).

Similarly, Blaine Martinez and Jennifer Wilke testified they first met Vargas at Ferneau's (Tr. 1071-72, 1109). According to Martinez, Vargas has drugs for sale (Tr. 1111-12). Although Martinez did not initially buy any drugs from Vargas, he contacted Barth who arrived with money to purchase drugs (Tr. 1111-12). Martinez testified that after he first met Vargas, he began obtaining meth from Vargas, some of which occurred at Ferneau's trailer (Tr. 1116-17).

In April 2000, Martinez and Wilke were in possession of methamphetamine and marijuana when they were arrested (Tr. 1062-63, 1101-02). Both Martinez and Wilke testified that they had obtained the methamphetamine from Vargas at a Super 8 Motel in Bismarck a day or two earlier (Tr. 1062-63, 1101-02). Business records from the Super 8 Motel indicated Vargas has stayed there in April 2000 (Tr. 1147-48, 1151).

Fernandez also testified to a trip in which Vargas gave Barth and another man a ride to Idaho. Fernandez was traveling to Washington while Vargas was giving Barth and the other man, whose name Fernandez did not really know, a ride to Idaho (Tr. 861). Fernandez traveled in a separate car (Tr. 862).

Jason Kramer testified that he took a trip to Idaho with Vargas, Barth, and another man to obtain a vehicle, and that Fernandez was traveling in another vehicle (Tr. 657-62). Kramer had previously met Vargas and Fernandez at Barth's shop (Tr. 658). During the trip, Vargas talked of his importing drugs to Bismarck and indicated that the drugs were in Fernandez's vehicle (Tr. 660). In addition, Barth

indicated to Kramer that the men they were traveling with were the source of his drugs (Tr. 658-59).

Other witnesses also implicated Vargas on the drug charges.  Charles Chadwick testified that Patty Rhone put him in contact with Vargas, and that they arranged for Chadwick to transport drugs from the west coast (Tr. 987-90).  Chadwick acknowledged he did so on two occasions (Tr. 987-90).  Scott Messmer testified that Vargas asked him to transport drugs for Vargas (Tr. 1198).  Patricia Walsh testified [that] she saw Vargas bring marijuana to Ferneau's, and saw Fernandez distribute methamphetamine to Patty Rhone (Tr. 1159-60, 1162-63).

Fernandez testified about Vargas obtaining a gun from Barth in exchange for cocaine (Tr. 853-54).  According to Fernandez, Vargas need the gun because a man named Blaine owed Vargas money for drugs (Tr. 858-59).  Blaine Martinez testified that he owed Vargas for the methamphetamine which was seized when he was arrested (Tr. 1118).  According to Martinez, Vargas found Martinez and threatened him with a gun (Tr. 1118).

. . .

Tim Sailer, an inmate at the Burleigh County Detention Center in 2001, testified about a pistol he previously owned, an S&K .40 caliber semi-automatic (Tr. 1276).  While he was incarcerated, Sailer stated he was locked up with a man by the name of "Gregorio Velasco" who was there on an illegal immigration matter (Tr. 1275-76).  Velasco was identified by a Border Patrol Agent and by a former Burleigh County Detention Officer as Defendant Vargas (Tr. 579-83, 1280-85).  Sailer testified that Velasco a/k/a Vargas told him about a gun and a gun case that fit the description of a handgun and case Sailer had once owned (Tr. 1276-78).  Sailer stated Velasco a/k/a Vargas indicated he had obtained the gun from Barth (Tr. 1277).  Sailer identified the gun at trial (Exhibit 117) as the one he previously owned (Tr. 1276).  This gun had been seized during a traffic stop of a vehicle driven by Vargas in Minnesota (Tr. 1263-66).  Furthermore, there was a photo (Government Trial Exhibit 64) of Vargas handling the firearm at the Super 8 Motel in Bismarck introduced at trial (Tr. 784-86, 852-53).

See Government's Response Brief, pp. 23-27.

As the record reflects, no less than nine witnesses implicated Vargas as to the drug charges and the evidence as to the firearm charge was overwhelming.  The Court finds that even if defense counsel's failure to object to Detective Becker's testimony regarding Ferneau's voicemail and subsequent phone call was deficient, Vargas has failed to establish a reasonable probability that the

results of the trial would have been different.[2]  The Court finds that there was overwhelming evidence of Vargas' guilt on all four counts.  The Court further finds that there is no reasonable probability that the result would have been different.  Vargas' claims that the alleged hearsay evidence played a significant role in his conviction must fail as a matter of law.

### d.    <u>SEVERANCE</u>

Vargas asserts that his trial counsel was ineffective in failing to file a motion to sever his case from the other defendants.  Vargas contends that his defense counsel should have moved for a severance once he reviewed Detective Becker's investigative report in regard to Ferneau's statements (i.e., the evidence discussed above).  Vargas contends that if his trial were severed from Ferneau's the evidence of her voicemail and phone calls to Detective Becker would not have been admissible.  The Government argues that, because of the overwhelming evidence against him, Vargas cannot show that he was prejudiced by trial counsel's failure to move for a severance.

Vargas must first establish that a motion to sever would have been successful.  A severance under Rule 14 of the Federal Rules of Criminal Procedure should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." <u>Zafiro v. United States</u>, 506 U.S. 534, 538 (1993).  However, a defendant is "not entitled to severance merely because they may have a better chance of acquittal in separate trials." <u>Id.</u>  As a general rule, persons charged with a conspiracy will be tried together, especially where proof of the charges against each of the defendants is based on the same evidence and acts.  <u>United States v. Foote</u>, 920 F.2d 1395, 1398 (8th

---

[2]As the Government notes, other evidence of threats by Vargas was admitted at trial and Vargas has not contested that such evidence was improper.  <u>See</u> Government's Response Brief, pp. 27-28

Cir. 1990) (citing <u>United States v. O'Meara</u>, 895 F.2d 1216, 1218 (8th Cir.) <u>cert.</u> <u>denied</u>, 498 U.S. 943 (1990)).

It is well-established that a defendant can demonstrate real prejudice to his right to a fair trial by showing (a) his defense is irreconcilable with that of his co-defendant or (b) the jury will be unable to compartmentalize the evidence as it relates to the separate defendants. <u>United States v. Washington</u>, 318 F.3d 845, 858 (8th Cir. 2003). The risk of prejudice posed by joint trials is best cured by careful and thorough jury instructions. <u>United States v. Mickelson</u>, 378 F.3d 810, 818 (8th Cir. 2004). The defendant has the burden to establish that severance is warranted and necessary. <u>Bear Stops v. United States</u>, 204 F. Supp.2d 1209, 1215-1216 (D. S.D. 2002).

The Court finds that Vargas has failed to establish that a motion for severance would have been granted. Vargas has failed to show that his defense was irreconcilable with that of his co-defendants. The acquittal of one of the co-defendants belies any claim by Vargas that the jury was unable to compartmentalize the evidence. Thus, Vargas' trial counsel's failure to move for severance cannot be considered ineffective because there was no basis for the motion.

Even if Vargas were able to show that severance was warranted under the circumstances, Vargas has failed to establish that the results of a separate trial would have been different. As detailed above, even without Detective Becker's testimony about the voicemail and phone calls from Ferneau, the evidence against Vargas was overwhelming. Vargas' claim that his counsel's failure to move to sever his trial from that of his co-defendants played a significant role in his conviction must fail as a matter of law. The Court finds that there is no reasonable probability that the result would have been different.

e.    **STATEMENTS TO POLICE**

Vargas next asserts that his trial counsel was ineffective for failing to move to suppress statements Vargas made to Morton County Deputy Sheriff Dion Bitz after his arrest.  Vargas asserts that the statements were incriminating, damaging, and prejudicial to his defense.  Vargas asserts that any allegedly incriminating statements he made were made after he was arrested, but before his Miranda rights were read to him.  Vargas argues that he requested that his trial counsel file a motion to suppress, but counsel failed to follow Vargas' directive.  The Government contends that Vargas cannot show that a motion to suppress would have been successful or that there was a reasonable probability the outcome of the trial would have been different.

Morton County Deputy Sheriff Dion Bitz testified at trial regarding the traffic stop in question.  Deputy Sheriff Bitz arrested Vargas for driving with a suspended license and on an immigration warrant for illegally being in the United States.  See Trial Tr. 561-562.  Vargas was driving a black Fiero at the time  of his arrest.  See Trial Tr. 558-559.  After Officer Bitz stopped Vargas and obtained Vargas' Washington State driver's license, Bitz inquired about the owner of the vehicle.  Vargas indicated that the vehicle belonged to Vargas' nephew, even though it was registered to an individual named Kelly Froelich from Mandan.  See Trial Tr. 558-560.  After transporting Vargas to the law enforcement center in Mandan, Officer Bitz informed Vargas of his Miranda rights.  See Trial Tr. 563.  According to Officer Bitz' testimony, Vargas gave essentially the following information during questioning:  (1) Vargas' nephew Jaun Quintero had traded the white van to Shawn Barth for the black Fiero that Vargas had been driving; (2) Vargas did not know Shawn Barth; (3) Vargas was traveling from Avon, Minnesota, to Washington; (4) Vargas had obtained his driver's license, even though he was illegally in the United States, by simply going to

the Department of Motor Vehicles; (5) that Vargas was in the United States illegally; and (6) Vargas was in the United States because he had family in Washington.  <u>See</u> Trial Tr. 563-565, 567-568.

After the questioning, Officer Bitz checked Vargas' body for tattoos at the request of an Immigration and Naturalization Services agent.  <u>See</u> Trial Tr. 565-567.  Vargas then began asking Officer Bitz to give him a break.  <u>See</u> Trial Tr. 567-568.  Vargas asked Bitz several times to give him a break.  <u>See</u> Trial Tr. 567-568.  After Officer Bitz advised Vargas that he could not do so, Vargas spontaneously blurted out  information regarding his past drug-related problems, stating that he had a bad history with drugs and that he was "fucked."  <u>See</u> Trial Tr. 568.

In order to obtain relief, Vargas must show that his suppression claim is "meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence."  <u>Kimmelman v. Morrison</u>, 477 U.S. 365, 375 (1986) (where allegation of ineffective assistance of counsel claim is based on a failure to litigate Fourth Amendment claim, defendant must "prove that Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence").

It is clear that the government may not use statements, whether exculpatory or inculpatory, stemming from a custodial interrogation of a defendant, unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.  <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966).  It is incumbent upon the government to demonstrate that the defendant voluntarily, knowingly, and intelligently waived his privilege against self-incrimination and his right to have retained or appointed counsel.  384 U.S. 436, 475.  The government has the burden of proving the validity of the <u>Miranda</u> waiver by a preponderance of the evidence.  <u>Colorado v. Connelly</u>, 479 U.S. 157, 168-169 (1986).

The record before the Court contains the testimony of Officer Bitz that he read Vargas his Miranda rights (Trial Tr. 563) and the statement in Vargas' affidavit that he did not waive his Miranda rights (Docket No. 1-14). The Court finds it unnecessary to resolve this dispute. Even if the Court were to determine that Vargas' statements were improperly admitted, Vargas has failed to establish a reasonable probability that the outcome of the trial would have been different. Although the statements were arguably inculpatory , the other evidence against Vargas was overwhelming. In the absence of Vargas' statement there were numerous witnesses who implicated Vargas in connection with the drug trafficking offenses and there was ample evidence, wholly independent from his statements, that established that Vargas was in the United States illegally and in possession firearm(s). Thus, Vargas' claim that his counsel failed to move to suppress his statements played a significant role in his conviction must fail as a matter of law. The Court finds that there is no reasonable probability that the result of the trial would have been different had the statements been suppressed.

### f.   TESTIMONY OF GOVERNMENT WITNESSES CONCERNING IDENTIFICATIONS

Vargas also claims that his trial counsel was ineffective for failing to seek suppression of witness identifications of him, arguing that the witnesses had been subjected to suggestive pretrial identification practices because they were only shown one picture during interviews by law enforcement and this process violated his Fifth Amendment right to due process. The witnesses Vargas identifies are William Canada, Jason Kramer, James Rhone, Leslie Schmidt, and Tim Sailer. The Government argues that four of the witnesses Vargas complains about did not make an in-court identification at trial and that, considering the totality of the circumstances, Vargas failed to show

that there was a substantial likelihood that the one witness who made an in-court identification misidentified Vargas.

In addressing a claim of an improper identification process, the court applies the two-part test the United States Supreme Court adopted in Manson v. Brathwaite, 432 U.S. 98 (1977).  See United States v. Murdock, 928 F.2d 293, 297 (8th Cir. 1991).  First, the court must determine whether the challenged confrontation was impermissibly suggestive.  The factors to be considered in determining if a pretrial identification procedure was impermissibly suggestive include:  (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of any prior description of the criminal, (4) the level of certainty demonstrated at the confrontation, and (5) the time between the crime and the confrontation. United States v. Gipson, 383 F.3d 689, 698 (8th Cir. 2004).  The Eighth Circuit has held that a single photo array is impermissibly suggestive.  United States v. Murdock, 928 F.2d 293, 297 (8th Cir. 1991). If the court determines that the pretrial identification procedure was impermissibly suggestive,  the court must then determine whether, under the totality of the circumstances, the suggestive procedures created "a very substantial likelihood of irreparable misidentification."  See United States v. Murdock, 928 F.2d 293, 297 (8th Cir. 1991) (citing  Manson v. Brathwaite, 432 U.S. 98 (1977)).

As to witness William Canada, the record reveals that Canada made an in-court identification of Vargas.  See Trial Tr. 405-406.  The reports of a May 22, 2003, interview of Canada submitted by Vargas, (Docket No. 1-9, Exhibit G), provide that after a period of frequent contact with Vargas' co-defendant Shawn Barth, Barth arranged for two Mexicans to stay at Canada's house.  During the interview, Canada discussed his encounters with the two Mexicans.  After Canada made the previous statements, the investigators showed Canada a photo of a person Canada identified as Vargas.  At

trial, Canada relayed the same information.  <u>See</u> Trial Tr. 404-405.  When asked to describe what the two Mexicans looked like, Canada spontaneously pointed to Vargas and stated, "There's one of them sitting right over there."  <u>See</u> Trial Tr. 406.

Vargas has arguably satisfied the first prong of the <u>Manson</u> test based on the Eighth Circuit's holding that a single photo array is impermissibly suggestive.  <u>See</u> <u>United States v. Murdock</u>, 928 F.2d 293, 297 (8th Cir. 1991).  However, that does not end the inquiry.  The Court must also determine whether, under the totality of the circumstances, the suggestive procedures created a very substantial likelihood of irreparable misidentification.  <u>See</u> <u>United States v. Murdock</u>, 928 F.2d 293, 297 (8th Cir. 1991) (citing  <u>Manson v. Brathwaite</u>, 432 U.S. 98 (1977)).  Canada's trial testimony and the investigative reports indicate that the two Mexicans spent a minimum of a couple hours at Canada's home and that Canada also saw them the next day.  Canada clearly had an extended time to view Vargas.  <u>See</u> <u>United States v. Murdock</u>, 928 F.2d 293, 297 (8th Cir. 1991) (holding that bank tellers had a "substantial amount of time to view the robber").   Under the circumstances, the Court finds that Vargas has failed to establish a substantial likelihood of misidentification.  To the contrary, the circumstances under which Canada interacted with Vargas lend credibility to his identification.  Unlike the numerous cases cited by both parties, Canada was not a victim of a crime who observed Vargas for a limited period during a stressful time.  Rather, Canada was introduced to Vargas, and Vargas spent a considerable length of time as a guest in Canada's home.

The four other witnesses mentioned by Vargas did not identify Vargas in court.  As with Canada, during pretrial interviews each of these witnesses was shown a single photo and they identified the individual as Vargas.  Again assuming this procedure was impermissibly suggestive, the Court will examine whether, under the totality of the circumstances, the suggestive procedure created a very substantial likelihood of irreparable misidentification.

As to witness Jason Kramer, the record reveals that in an interview held on November 11, 2000, Kramer told officers that Barth dealt drugs with a couple of Mexicans.  See Docket No. 1-9, Exhibit H.  In August of 2000, Kramer and Barth rode with the two Mexicans to Idaho.  Kramer also reported that he had previously seen the Mexicans at Barth's residence.  Kramer told the officers that a person owed Rosalio money for drugs.  Kramer reported that he had seen Rosalio on one occasion and that he first met "Berto" (Rigaberto Fernandez) and Rosalio in late July or early August 2000.  Kramer informed officers that Rosalio had told Kramer they make weekly drugs trips through Bismarck.  When shown  photographs of Vargas and Fernandez , Kramer identified the persons depicted in the photos as Rosalio and "Berto."

At trial, Kramer testified that in July or August of 2000, he and Barth traveled with Rosalio Vargas and "Beto" on a trip to Idaho.  See Trial Tr. 657-661.  Barth asked Kramer to go along to retrieve a car.  See Trial Tr. 658.  During the trip, Kramer rode in a Surburban with Vargas, Barth, and another individual, while "Beto" drove another vehicle.  See Trial Tr. 659-666.  During the trip, Kramer heard Vargas speak about transporting drugs on the trip, specifically that "Beto" had the drugs in the car he was driving and that Vargas was carrying the money.  See Trial Tr. 659-660.  It is undisputed that Kramer did not identify Vargas at trial.

Similar to Canada, Kramer had an extended opportunity to interact with Vargas on the trip to Idaho and back.  Kramer's identification of Vargas took place within three to four months of his encounters with Vargas.  Kramer's testimony was corroborated in large part by cooperating co-defendant Rigoberto "Beto" Fernandez.  The Court finds that based on the totality of the circumstances, Vargas has failed to establish a substantial likelihood of misidentification.

As to witness James Rhone, the record reveals that at trial Rhone testified that the first time he met an individual referred to as "Poncho" was when Poncho and "Beto" approached him at

Nancy Ferneau's house and spoke to him about selling methamphetamine.  <u>See</u> Trial Tr. 951, 920.

Rhone stated that he had previously seen Poncho and "Beto" on two occasions, but had not spoken

to them.  <u>See</u> Trial Tr. 915-916.  Rhone testified that it was Poncho who spoke with him about

selling drugs.  <u>See</u> Trial Tr. 916.  Poncho and "Beto" told Rhone they were getting their drugs from

Seattle.  <u>See</u> Trial Tr. 916-917.  Rhone testified that he was present on more than one occasion when

Poncho and "Beto" would deliver drugs to Ferneau's home.  <u>See</u> Trial Tr. 917.  Rhone testified that

Poncho and "Beto" would break up the methamphetamine and give him (Rhone) some to sell.  <u>See</u>

Trial Tr. 918-919, 924-925).  After selling the  methamphetamine, Rhone gave the proceeds of the

sales to Poncho or "Beto".  <u>See</u> Trial Tr. 919.  Rhone testified that later he would obtain

methamphetamine from Poncho or "Beto" at a Bismarck hotel.  <u>See</u> Trial Tr. 922-923.  Rhone's

dealings with Poncho and Beto began in the spring of 2000 and continued about five or six months

until he went to prison in September 2000.  <u>See</u> Trial Tr. 926.  In a pretrial interview on February

2, 2001, Rhone recounts some of the same information he testified to at trial.  <u>See</u> Docket No. 1-11.

During the interview, Rhone identified a photo of Vargas as "Poncho" and a photo of Rigoberto

Fernandez as "Beto."  It is undisputed that Rhone did not identify Vargas at trial.

       Similar to Canada and Kramer, Rhone had an extended opportunity to interact with Vargas

during the numerous times he obtained methamphetamine from Vargas.  Rhone's identification took

place six or more months after Rhone's last encounter with Vargas.  Nevertheless, the record

establishes that Rhone had numerous opportunities to observe Vargas in close settings.  The Court

finds that under the totality of the circumstances, Vargas has failed to establish a substantial

likelihood of misidentification.

       As to witness Leslie Schmidt, the record establishes that she had met Vargas three or four

times, with the first meeting occurring in the summer of 2000.  <u>See</u> Trial Tr. 602.  Vargas came to

Schmidt's place of work (Auto Air & Cruise) to pick up a vehicle and to drop off another vehicle. See Trial Tr. 598, 601-602. Schmidt testified to paperwork from Auto Air & Cruise signed by Rosalio Vargas. See Trial Tr. 598-599. In one of those meetings, Schmidt looked at Vargas' driver's license in order to correctly spell Vargas' name. See Trial Tr. 602. In the latter part of 2002, after Barth was released from state prison, Vargas returned to Auto Air & Cruise looking for Barth or for a way to contact Barth. See Trial Tr. 603, 605. Schmidt provided Barth's telephone number to Vargas. See Trial Tr. 604. It is undisputed that Schmidt did not identify Vargas at trial.

In a February 22, 2001, interview with law enforcement, Schmidt provided information similar to her trial testimony, including Vargas' name. See Docket No. 1-12. During the interview, Schmidt was shown a photo of a person whom she identified as Vargas.

Like the other witnesses, Schmidt had multiple opportunities to interact with Vargas, including an occasion to examine his driver's license. Schmidt's identification took place six or more months after Schmidt's first two encounters with Vargas. The record establishes that Schmidt had several opportunities to observe Vargas in close settings. The Court finds that under the totality of the circumstances, Vargas has failed to establish a substantial likelihood of misidentification.

Finally, as to witness Tim Sailer, Sailer testified that while he was incarcerated at the Burleigh County Detention Center in 2001, he met a man by the name of "Gregorio Velasco" who was there on an illegal immigration matter. See Trial Tr. 1275-1276. Sailer testified that Velasco described a gun and a gun case that Sailer thought fit the description of a handgun and case that Sailed had once owned. See Trial Tr. 1276-1278. It is undisputed that Sailer did not identify Vargas at trial and did not testify that Velasco and Vargas were the same person.

The Court finds that Vargas' assertion that his rights were violated by an impermissibly suggestive identification by Tim Sailer are wholly without merit because the record reflects that

Sailer never identified Vargas at trial.  Even if Sailer had made an identification of Vargas as "Velasco," the Court finds that Sailer as a cell mate of Velasco's would have had substantial time to observe Velasco.  The Court finds that under the totality of the circumstances, Vargas has failed to establish a substantial likelihood of misidentification had an identification occurred.

In summary, the Court finds that, although the use of a single photo array has been determined to be impermissibly suggestive, Vargas has failed to establish that under the totality of the circumstances, the suggestive procedures created a very substantial likelihood of irreparable misidentification.  Even if the Court were to find that the identifications of the witnesses were inadmissible, the remaining evidence against Vargas was substantial.  As a result, the Court finds that Vargas' claim that his counsel was ineffective for failing to move to suppress witness identifications of him must fail as a matter of law.  The Court finds that there is no reasonable probability that the result of the trial would have been different had the identifications been suppressed.

### g.     CROSS-EXAMINATION AND IMPEACHMENT OF GOVERNMENT WITNESSES

Vargas next asserts that he received ineffective assistance of trial counsel when counsel failed to adequately cross-examine and impeach several of the Government's witnesses.  Vargas specifically challenges the testimony of Blaine Martinez and Tim Sailer.  The Government asserts that there is no reasonable probability that the results of the trial would have been different had Vargas' counsel cross-examined Martinez and Sailer in the manner Vargas suggests.

A trial counsel's cross-examination techniques, like other matters of trial strategy, are entrusted to the professional discretion of counsel.  United States v. Villalpando, 259 F.3d 934, 939

(8th Cir. 2001).  Counsel's cross-examination may, in some instances, be so unreasonable that it may constitute ineffective assistance of counsel.  Id.  The Eighth Circuit has found a counsel's cross-examination techniques to be ineffective in instances where counsel "failed to cross-examine a witness who made grossly inconsistent prior statement."  Whitfield v. Bowersox, 324 F.3d 1009, 1017 (8th Cir. 2003)(citing Hadley v. Groose, 97 F.3d 1131, 1135-1136 (8th Cir. 1996) and Driscoll v. Delo, 71 F.3d 701, 709-711 (8th Cir. 1995)).

As to Blaine Martinez, Vargas asserts that his trial counsel was ineffective for not impeaching Martinez with certain inconsistencies between his trial testimony and his grand jury testimony.  Specifically, Vargas claims the following inconsistencies should have been explored on cross-examination:  (1) the date Martinez first met Vargas; (2) the amount of methamphetamine Martinez obtained from Vargas at the Super 8 Motel in April 2000; (3) the total amount of methamphetamine Martinez obtain from Vargas; (4) the amount of methamphetamine Barth had in his possession when he picked up Martinez from jail; and (5) whether Barth purchased drugs the first time he met Vargas.

The record reveals that at trial Martinez testified that he met Vargas around April of 2000, and Martinez' grand jury testimony states he met Vargas four months before he was arrested in April of 2000.  See Trial Tr. 1109; Grand Jury Tr. 9.  The Court finds the discrepancy between the trial testimony and grand jury testimony on this point does not rise to the level of a grossly inconsistent prior statement.

At trial Martinez testified that he purchased one pound of methamphetamine from Vargas at the Super 8 Motel in April of 2000, and during his grand jury testimony, Martinez stated the amount was two pounds.  See Trial Tr. 1101; Grand Jury Tr. 7.  At trial Martinez testified that he received a total of four to five pounds of methamphetamine from Vargas and his grand jury

testimony reveals that Martinez testified he received 15 - 20 pounds of methamphetamine from Vargas.  See Trial Tr. 1117; Grand Jury Tr. 14.  The Court is perplexed as to why Vargas would have wanted his counsel to solicit more damaging testimony from Martinez as to the amount of drugs purchased from Vargas.  While such evidence may have shown Martinez' trial testimony was inconsistent with his grand jury testimony, its obvious effect would have been to incriminate Vargas in the distribution of even larger quantities of methamphetamine.  The Court finds that trial counsel's tactical decision to not elicit additional incriminating testimony from Martinez was reasonable and did not amount to ineffective assistance.

At trial Martinez testified that he did not see Barth buy drugs at their initial meeting, but that he believed Barth purchased drugs from Vargas at this time.  See Trial Tr. 1111-1112.  During his grand jury testimony, Martinez stated that Barth purchased cocaine at their initial meeting.  See Grand Jury Tr. 10.  Finally, at trial Martinez testified that he could not remember the amount of methamphetamine Barth had with him when he picked Martinez up from jail in April 2000, but during his grand jury testimony, Martinez indicated Barth had 12 ounces of methamphetamine in his possession when he picked Martinez up from jail.  See Trial Tr. 1119-1120; Grand Jury Tr. 16-17.  None of the testimony as to Barth implicated Vargas, and on that point alone, the Court finds that it was not ineffective assistance for Vargas' trial counsel to decline to further explore this testimony.     To the extent that Vargas is asserting a general failure of his counsel to attack Martinez' credibility and bias, the record reveals that trial counsel questioned Martinez about the amount he paid Vargas each time he (Martinez) received methamphetamine from Vargas.  Trial counsel impeached Martinez with his grand jury testimony on this topic.  See Trial Tr. 1134-1135. After carefully reviewing the grand jury testimony and the trial testimony of Martinez, including the cross-examination by Vargas' counsel, the Court finds that the cross-examination was not so

unreasonable as to constitute ineffective assistance of counsel.  Even if the Court were to find that trial counsel's performance fell below an objective standard of reasonableness, Vargas has failed to establish a reasonable probability that the outcome of the trial would have been different if the cross-examination he suggested had taken place.  Had counsel followed Vargas' suggested tactics, it most likely would have resulted in the admission of additional incriminating testimony.

As to the testimony of Tim Sailer, at trial Sailer testified that he did not know whether Vargas still had the gun he (Sailer) once owned, adding that Vargas did not say he (Vargas) still had the gun.  See Trial Tr. 1277.  In his grand jury testimony, Sailer stated that Vargas had given the gun to "one of his drivers or cousins."  See Grand Jury Tr. 8.  This is not testimony so grossly inconsistent that failure to cross-examine is deficient performance.  As the previously discussed, the evidence against Vargas as to the firearm charge was overwhelming.  Thus, even if the Court were to find that trial counsel's performance was unreasonable, Vargas has failed to establish a reasonable probability the results of the trial would have been different had counsel cross-examined Sailer as to the difference between his trial testimony and grand jury testimony.

h.   **REVIEWING PSI PRIOR TO SENTENCING**

Vargas contends that his counsel was ineffective for failing to review the Presentence Investigation Report ("PSR") with him prior to sentencing and that counsel erroneously led the Court to believe that counsel had reviewed the PSR with Vargas.  The Government argues that this claim must fail because Vargas has failed to demonstrate prejudice.

Rule 32(i)(1)(A) of the Federal Rules of Criminal Procedure states that, at sentencing, a court must verify that the defendant and the defendant's attorney have read and discussed the PSR and any addendum thereto.  The record reveals that at Vargas' sentencing hearing on February 26, 2004,

Vargas' counsel stated the following in response to the Court's inquiry as to whether he had received the PSR and reviewed it with Vargas:

> Your Honor, we have had opportunity to do both, and I did it with the interpreter, and we went through initially and we made a number of corrections, and then the — that's what led to the addendums, and we've gone through everything with my client.

See Sentencing Tr. 3-4.  The PSR also includes an addendum addressing several objections.  Thus, it appears that Vargas' assertion that he did not review the PSR prior to sentencing are improbable at best.  In any event, Vargas has failed to establish that any failure on his attorney's part resulted in prejudice.  In other words, Vargas failed to establish that the results of the sentencing hearing would have been different absent his counsel's alleged error.  The Court finds this claim must fail.


## 2.      INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

Vargas has also challenged the effectiveness of his appellate counsel.  Vargas asserts that his counsel failed to raise two issues on appeal, both of which relate to the application of the United States Sentencing Guidelines.  Specifically, Vargas asserts that his appellate counsel should have challenged the sentencing court's alleged failure to make sufficient findings to support the application of Section 3B1.1(a) and Section 2D1.1(b)(1) of the United States Sentencing Guidelines.


### a.      U.S.S.G. § 3B1.1(a) – AGGRAVATING ROLE

Vargas asserts that the Court failed to identify the five or more specific individuals involved in the criminal activity, that this failure was an error, and that Vargas' counsel should have raised this issue on appeal.  The Government responds by asserting that Vargas did coordinate the criminal activities of five or more individuals and thus, the application of Section 3B1.1(b) was appropriate and warranted.

33

Under U.S.S.G. § 3B1.1(a), a four-level sentencing enhancement is warranted "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive . . . ."  The Sentencing Guidelines explain that

> To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of one or more other participants.  An upward departure may be warranted, however, in the case of a defendant who did not organize, lead, manage, or supervise another participant, but who nevertheless exercised management responsibility over the property, assets, or activities of a criminal organization.

U.S.S.G. § 3B1.1, comment n.2.  An appellate court reviews a district court's factual findings under Section 3B1.1 for clear error.  United States v. Willis, 433 F.3d 634, 637 (2006).  In order to establish prejudice on this issue, Vargas must show that the Eighth Circuit Court of Appeals would have found the district court's findings clearly erroneous.  Becht v. United States, 403 F.3d 541, 545 (8th Cir. 2005).

At the sentencing hearing the Court addressed the application of Section 3B1.1 and stated the following:

> It's the Court's finding on this particular issue that the evidence was overwhelming at trial that Mr. Vargas was, in fact, the organizer and the ringleader – one of the ringleaders in this drug trafficking operation.  There was testimony, as I recall, from both Mr. Fernandez and from Charles Chadwick that Mr. Vargas directed them to transport meth from Washington to North Dakota for distribution to others.  There was also testimony that demonstrated that Mr. Vargas had coordinated those drug-trafficking activities with Nancy Ferneau and others who testified at the trial.  The court particularly finds that the testimony of those witnesses, namely, Rigoberto Fernandez and Charles Chadwick, that established Vargas's role as a ringleader was credible, accurate testimony at trial.

See Sentencing Tr. 7-8.  It is apparent from the trial testimony of Fernandez and Chadwick that Vargas was an organizer or leader of criminal activity that involved five or more individuals or was otherwise extensive.  There is no question that Vargas and his co-defendants Ferneau, Barth, and Fernandez (who pled guilty) were all involved in the drug conspiracy.  There was ample evidence

34

at trial establishing the participation of other individuals in the conspiracy, including Charles Chadwick, James Rhone, Patty Rhone, Blaine Martinez, and Jason Kramer.

In addition, there was also a plentitude of evidence to establish that Vargas was the organizer, leader, manager, or supervisor of one or more other participants. Fernandez testified to being recruited by Vargas to carry drugs by vehicle to Bismarck, for which Vargas offered to pay Fernandez $1,000 per trip. See Trial Tr. 838-840. Fernandez also testified that Vargas told him to deliver the drugs to Ferneau's residence. See Trial Tr. 842-843. Charles Chadwick testified that he transported methamphetamine for Vargas. See Trial Tr. 986. It is well-established that a trial court may rely on testimony of confederates or co-conspirators that it finds credible. United States v. Plancarte-Vazquez, 450 F.3d 848, 852 (8th Cir. 2006); United States v. Ortiz, 125 F.3d 630, 633-634 (8th Cir. 1997).

The Court find that Vargas has failed to establish that an appellate court would find the Court's findings at the sentencing hearing to be clearly erroneous. There was overwhelming evidence to establish that Vargas was an organizer or leader of criminal activity involving five or more participants. Thus, Vargas has failed to establish either deficient performance by appellate counsel or prejudice.[3] The Court further finds that Vargas' claim as to the failure to raise the application of Section 3B1.1 of the United States Sentencing Guidelines on appeal must fail.

---

[3]Vargas asserts that he was prejudiced because he was denied the opportunity to raise a claim under United States v. Booker, 543 U.S. 220 (2005), once his sentence was vacated and remanded for re-sentencing. Given the Court's conclusion that Vargas' counsel was not unreasonable in failing to advance the application of Section 3B1.1 to the appellate court, the Court finds it unnecessary to address Vargas' assertions as to Booker.

**b.**   **U.S.S.G. § 2D1.1(b)(1) – POSSESSION OF A DANGEROUS WEAPON**

Vargas also contends that his attorney was ineffective for failing to challenge the Court's two-level enhancement under Section 2D1.1(b)(1) of the United States Sentencing Guidelines for possession of a dangerous weapon.  Vargas asserts that the Court failed to make sufficient findings as to whether the possession of the firearm was in connection with the drug trafficking activity.  The Government argues that the record establishes without a doubt that the application of Section 2D1.1(b)(1) was appropriate and warranted.

Section 2D1.1(b)(1) of the United States Sentencing Guidelines requires a two-level increase if a dangerous weapon was possessed in connection with drug trafficking.  Application note 3 to Section 2D1.1(b)(1) provides that the two-level enhancement for a dangerous weapon applies "unless it is clearly improbable that the weapon was connected with the offense."  As with Vargas' other challenge to the application of the Sentencing Guidelines, Vargas must show that the Eighth Circuit Court of Appeals would have found the district court's findings clearly erroneous.  Becht v. United States, 403 F.3d 541, 545 (8th Cir. 2005).

At the sentencing hearing, the Court found that the facts set forth in the PSR concerning the possession of the handgun were accurate.  The Court further stated:

> Most of that evidence was addressed by Rigoberto Fernandez, who the Court has previously noted to have been a credible witness at trial.  Any attempt to deny possession of the handgun, I think, is frivolous in this case in light of the photographs that were offered and received into evidence, several of which depicted both Mr. Vargas and Mr. Fernandez displaying these handguns in a hotel room in Bismarck in different poses.  I believe most of the photographs were taken at a hotel or hotel rooms in Bismarck, several of their girlfriends in the room at the time.  That's difficult evidence to refute.  Photographs pretty much speak for themselves.

See Sentencing Tr. 13-14.  In addition, the trial testimony of Fernandez established that Vargas obtained the handgun from co-defendant Barth in exchange for cocaine.  See Trial Tr. 853-854.

36

The Court finds that Vargas has failed to establish that the Eighth Circuit Court of Appeals would conclude that the district court's findings were clearly erroneous.  The record contains more that adequate evidence to support the Court's findings that Vargas' possession of the firearms was in connection to the drug trafficking charges.  The Court finds that  Vargas' claim as to the failure to raise the application of Section 2D1.1(b)(1) of the United States Sentencing Guidelines on appeal must fail.

## III.    **CONCLUSION**

For the reasons set forth above, the Court **DENIES** the Defendant's Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255.  (Docket No. 193).

In addition, the Court certifies that an appeal from the denial of this motion may not be taken in forma pauperis because such an appeal would be frivolous and cannot be taken in good faith. Coppedge v. United States, 369 U.S. 438, 444-45 (1962).  Upon the entire record before the Court, dismissal of the motion is not debatable, reasonably subject to a different outcome on appeal, or otherwise deserving of further proceedings.  Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983). Therefore, a certificate of appealability will not be issued by this court.[4]

---

[4]The Court of Appeals for the Eighth Circuit has opined that the district courts possess the authority to issue Certificates of Appealability under Section 2253(c).  Tiedeman v. Benson, 122 F.3d 518, 522 (8th Cir. 1997).

If Vargas desires further review of his Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. § 2255, he may request the issuance of a certificate of appealability by a circuit judge of the Eighth Circuit Court of Appeals in accordance with <u>Tiedeman v. Benson</u>, 122 F.3d 518, 250-22 (8th Cir. 1997).

**IT IS SO ORDERED**

Dated this 17th day of January, 2007.

<u>*/s/  Daniel L. Hovland*</u>
Daniel L. Hovland, Chief Judge
United States District Court
